UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

RECEIPT NUMBER

532815

110

MANOR MOTORCAR CO. d/b/a
MERCEDES-BENZ OF NOVI, ESTATE
MOTORS LTD. d/b/a MERCEDES-BENZ
OF BLOOMFIELD HILLS, PARKVIEW
MOTORCAR, INC. d/b/a MERCEDES-BENZ
OF ROCHESTER HILLS, CHARLES J.
GHESQUIERE, JR., LEE B. GHESQUIERE
and C. J. GHESQUIERE, III,

      Plaintiffs,

vs.

MERCEDES-BENZ USA, INC.

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

JUDGE : O'Meara, John Corbett
DECK  : S. Division Civil Deck
DATE  : 10/20/2005 @ 13:06:32
CASE NUMBER : 5:05CV60243
CMP MANOR MOTORCAR CO, ET AL V.
MERCEDES BENZ, SI TAM

MAGISTRATE JUDGE MORGAN

## COMPLAINT

NOW COME Plaintiffs Manor Motorcar Company d/b/a Mercedes-Benz of Novi,

Estate Motors Ltd., d/b/a Mercedes-Benz of Bloomfield Hills, Parkview Motors, Ltd., d/b/a

Mercedes-Benz of Rochester Hills, Charles J. Ghesquiere, Jr., Lee B. Ghesquiere and, C. J.

Ghesquiere, III, who allege and say as follows:

### Parties

1.    Plaintiff Manor Motorcar Company, d/b/a Mercedes-Benz of Novi (hereinafter

"Manor Motorcar"), is a corporation organized and existing under laws of the State of

Michigan with its principal place of business in Oakland County, Michigan. Plaintiff Manor

Motorcar is a motor vehicle dealer holding the franchise agreement with Defendant Mercedes-

Benz USA, Inc. (hereinafter "MBUSA").

2.    Plaintiff, Estate Motors, Ltd. d/b/a Mercedes-Benz of Bloomfield Hills

(hereinafter "Estate Motors"), is a corporation organized and existing under laws of the State

of Michigan with its principal place of business in Oakland County, Michigan. Plaintiff Estate Motors is a motor vehicle dealer holding a franchise agreement with Defendant Mercedes-Benz USA, Inc.

3.      Plaintiff Parkview Motorcar, Inc., d/b/a Mercedes-Benz of Rochester Hills (hereinafter "Parkview Motors"), is a corporation organized and existing under laws of the State of Michigan with its principal place of business in Oakland County, Michigan. Plaintiff Parkview Motors is a motor vehicle dealer holding a franchise agreement with Defendant Mercedes-Benz USA, Inc. (Plaintiff Parkview Motors is hereinafter cumulatively with Estate Motors and Manor Motorcars referred to as the "Dealerships").

4.      Plaintiff Charles J. Ghesquiere, Jr. is an individual and is a citizen and resident of Michigan.

5.      Plaintiff Lee B. Ghesquiere is an individual and is a citizen and resident of Michigan.

6.      Plaintiff Charles J. Ghesquiere, III is an individual and is a citizen and resident of Michigan (hereinafter cumulatively with Charles J. Ghesquiere, Jr. and Lee B. Ghesquiere referred to as the "Ghesquieres").

7.      Defendant Mercedes-Benz USA, Inc. ("MBUSA") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New Jersey. MBUSA is a manufacturer and distributor of new motor vehicles.

-2-

## Jurisdiction

8.      This Court has jurisdiction over this cause pursuant to 28 U.S.C. § 1332, diversity of citizenship. The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

## General Allegations

### *A Seemingly Mutually Beneficial Relationship*

9.      The Ghesquieres are long term business associates of MBUSA.  They have owned and operated Mercedes-Benz dealerships for approximately 30 years.  Through the operation and expansion of their Mercedes-Benz dealerships, the Ghesquieres rely on MBUSA to be a trustworthy company that operates in accordance with customary business practices and only conducts business in good faith.

10.      The Plaintiffs, believing MBUSA to be a trustworthy company, have manifested their belief in MBUSA by investing heavily in the promotion and sale of Mercedes-Benz products.  The Ghesquieres acquired three Mercedes-Benz dealerships in the Detroit area.  The ownership of all three of these dealerships by the Ghesquieres is a testament to their commitment to MBUSA and the promotion and sale of Mercedes products.

11.      In early 1996, MBUSA approached the Ghesquieres with the idea of obtaining financial assistance from the Ghesquieres, through their only Mercedes-Benz dealership at the time - Estate Motors, to acquire and subsequently close the Wood Mercedes-Benz dealership on the northeast side of Detroit, Michigan.  MBUSA represented to the Ghesquieres that the Wood dealership was n ot p erforming well and MBUSA did not believe that the market justified a dealership in that location.  Thus, MBUSA proposed that, with MBUSA's financial

-3-

assistance, Estate Motors acquire the assets of the Wood dealership and consolidate those assets with the Estate Motors dealership.

12.    On May 15, 1996, Estate Motors entered into a formal agreement with MBUSA in which Estate Motors would be obligated to acquire the Wood Mercedes-Benz dealership and then be allowed to consolidate the Wood dealership with Estate Motors. The May 15, 1996 agreement also placed additional obligations on, and granted additional rights to, both MBUSA and Estate Motors. Under the terms of the agreement entered into on May 15, 1996, Estate Motors was to establish a new Mercedes-Benz dealership in the vicinity of Farmington Hills. In return for its agreement to acquire the Wood dealership and construct a new sales and service facility in the vicinity of Farmington Hills, MBUSA granted Estate Motors a right of first refusal on the right to acquire the next Mercedes-Benz dealership to be added to the greater Detroit Area. The May 15, 1996 Agreement is attached hereto as "Exhibit A" and is incorporated herein by reference.

13.    In compliance with the 1996 Agreement, Charles J. Ghesquiere, Jr., expended approximately $1,500,000 in order to acquire the Wood dealership and to consolidate it with Estate Motors. Mr. Ghesquiere spent approximately $9,000,000 to renovate the Estate Motors location to accommodate the consolidation of the Wood dealership into that location. In addition, the Ghesquieres expended approximately $6,000,000 on the acquisition of land and construction of a new Mercedes-Benz sales and service center in Novi, Michigan in order to comply with the requirement to establish a new dealership in the vicinity of Farmington Hills. The renovation of Estate Motors and establishment of the new sales and service center in Novi

-4-

were accomplished at the direction of, and with the knowledge and express consent, of Mercedes-Benz.

14.     At some point prior the summer of 1999, MBUSA determined that it desired additional dealership representation in the Rochester Hills area, North of Detroit. MBUSA again approached the Ghesquieres regarding establishing a new dealership.

15.     On July 16, 1999, the Ghesquieres, Estate Motors, and Manor Motorcar Co. entered into a contract with MBUSA. The contract set forth the terms for establishing an additional full sales and service Mercedes-Benz center for both passenger cars and light trucks manufactured by MBUSA in the vicinity of Rochester Hills. A copy of the July 16, 1999 Agreement is attached hereto as "Exhibit B" and is incorporated herein by reference.

16.     Pursuant to the July 16, 1999 Agreement, the Ghesquieres expended approximately $6,000,000 to acquire land and build a new Mercedes-Benz dealership in Rochester Hills. That dealership is owned by Parkview Motors.

17.     The July 16, 1999 Agreement contained a right of first refusal in favor of the Ghesquieres, to wit:

>           In the event MBUSA determines to establish an additional
>           Mercedes-Benz retail center in the Detroit Metropolitan
>           Market, MBUSA herewith grants to the Ghesquieres a right of
>           first refusal to establish such center. The term of this right of
>           first refusal expires May 31, 2003.

18.     The Dealerships have each entered into the following franchise agreements with MBUSA: a "Mercedes-Benz Passenger Car Dealer Agreement" and a "Mercedes-Benz Light Truck Dealer Agreement" (hereinafter the "Franchise Agreements"). These contracts set forth the terms and conditions that govern the franchise relationship between MBUSA and

-5-

Plaintiffs. At all times material hereto, Plaintiffs have complied with all reasonable and relevant terms and conditions of these Franchise Agreements. Incorporated into the Franchise Agreements are either Mercedes-Benz Passenger Car Dealer Agreement Standard Provisions or Mercedes-Benz Light Truck Standard Provisions. These Standard Provisions are identical for all three Franchise Agreements and one copy of each set of Standard Provisions are attached hereto as "Exhibit C" and "Exhibit D", both of which are incorporated herein by reference.

### *The Deception*

19.     The economically prosperous and symbiotic relationship enjoyed by the Plaintiffs and MBUSA began to wane upon a change in executive management at MBUSA on or about September 24, 1999.

20.     Following the change in executive management, the Dealerships, which had been the subject of praise by the former President of MBUSA, fell under fire. The greater Detroit market area, which includes the Dealerships, was determined by MBUSA to not be selling and servicing a sufficient number of Mercedes-Benz vehicles. Upon information and belief, the new executive management team at MBUSA determined that the solution to this alleged shortfall in the Detroit market was to add an additional dealership.

21.     However, in order to avoid being forced to comply with the right of first refusal arising out of the July 16, 1999 Agreement, MBUSA, upon information and belief, decided to delay making an official announcement of the placement of another dealership in the Detroit market. As a result, upon information and belief, MBUSA began and concluded negotiations

-6-

with a third party to award to the third party a Mercedes-Benz dealership that would be placed in the Detroit market.

22.     In contrast to the alleged determination that the Detroit market was underperforming, the MBUSA Regional Manager was directed by the new executive management team to stop the construction of the Ghesquieres' Rochester Hill's Mercedes-Benz dealership. The MBUSA Regional Manager informed the Ghesquieres that the new executive management team at MBUSA did not want the Rochester Hills facility built because "the Ghesquieres had too many dealerships."

23.     Upon information and belief, the subject of the Ghesquieres came up in numerous "state of the market" franchise network meetings held regularly at MBUSA headquarters. Statements were made at those meetings by the new MBUSA executive management that the Ghesquieres "needed to be broken" and that the Ghesquieres "had too much power."

24.     At all times from 1996 through the present, the Dealerships have met or exceeded all reasonable sales and service standards set by Mercedes-Benz.

25.     Despite the substantial investment the Ghesquieres had made in the Mercedes-Benz linemake and their success in selling and servicing Mercedes-Benz vehicles, it appears that MBUSA, without justification, simply did not want to place another dealership in the hands of the Ghesquieres and instead headed down a path of deception to prevent the Ghesquieres from exercising their contractual right of first refusal.

26.     Prior to September 1, 2004, MBUSA communicated to the Ghesquieres that it intended to proceed with establishing additional representation in the Grosse Pointe/Detroit

-7-

Area and perhaps an additional point in the Dearborn Area. This intent was memorialized in a letter to Charles J. Ghesquicre, Jr., on September 1, 2004.

27.     On July 30, 2005, MBUSA sent a letter to Charles J. Ghesquicre, Jr. The letter informed Mr. Ghesquicre that MBUSA had entered into a contract with a third party for the establishment of a new Mercedes-Benz dealership within the Detroit Metropolitan Market. The letter informed Mr. Ghesquiere that the new dealership would be located at 20200/20210 East Nine Mile Road in St. Clair Shores, Michigan. The letter also stated that MBUSA anticipated that the new dealership would be complete in the first half of 2006.

28.     The new dealership located at 20200/20210 East Nine Mile Road is also in the Detroit Metropolitan Market, where Plaintiffs' Rochester Hills, Novi and Bloomfield Hills dealerships are also located.

29.     Most astonishingly, the new dealership is to be located within 2 miles of the original Wood dealership location that was acquired by Estate Motors pursuant to the original May 15, 1996 Agreement. This is the very same dealership that Estate Motors acquired for $1,500,000 in order to consolidate the market.

30.     The July 30th letter announcing the new dealership came as a surprise to the Ghesquieres. The Plaintiffs, on several occasions, had attempted to exercise their right of first refusal by requesting to obtain a new location to expand their sales and service facilities. The Plaintiffs even attempted to acquire the exact location that the new dealership is to be built upon. In response, MBUSA always informed the Plaintiffs, as they had when first approaching the Ghesquieres concerning acquiring the Wood dealership, that the market would not support

-8-

a dealer in that location. MBUSA used these tactics to fend off the Plaintiffs' attempts to exercise their right of first refusal until such time as it expired under its own terms.

31.     Defendant MBUSA knew of the Plaintiffs' desire to expand their prosperous enterprise and, through deception, intentionally frustrated Plaintiffs' efforts to expand.

32.     Defendant MBUSA knew of the Plaintiffs' desire to protect the goodwill that the Plaintiffs had established for their dealerships and in the Mercedes-Benz trade name in the greater Detroit area. MBUSA's knowledge of the Plaintiffs' desire to protect the goodwill their dealerships created is evidenced by the Plaintiffs' constant insistence that each agreement entered into with MBUSA contain a right of first refusal. Further, knowledge of this desire can be inferred on the part of MBUSA by Plaintiffs' numerous attempts to open an additional sales and service center. Despite this knowledge, MBUSA intentionally frustrated Plaintiffs' efforts to expand and protect its self-generated goodwill.

33.     MBUSA's desire to benefit itself through deceptive tactics that constitute bad faith, at the expense of Plaintiffs, are evidenced by numerous commercial threats made toward the Plaintiffs by agents of MBUSA. Upon learning of the proposed reopening of a Mercedes-Benz dealership in Northeast Detroit, the Ghesquieres requested and obtained a meeting with MBUSA representatives. At this meeting the Ghesquieres complained of the lost benefit which was to obtained from the purchase of the Wood dealership and further complained that MBUSA had not acted in good faith in honoring the Ghesquieres' right of first refusal to open any Mercedes-Benz dealership proposed for the Detroit area. In response to these very legitimate complaints, the MBUSA Sales Manager threatened the Ghesquieres with a market study which had allegedly been conducted on adding a new Mercedes-Benz dealership in the

area of Dearborn, Michigan.  This threatened additional dealership point would also have a

devastating effect upon the Ghesquieres' dealerships.  MBUSA informed the Ghesquieres that

if they did not stop complaining about the proposed dealership in Northeast Detroit that

MBUSA would proceed with opening a dealership in Dearborn.  In addition, the Ghesquieres

were told by MBUSA that the new executive management at MBUSA believed that the

existing Mercedes-Benz dealers were "spoiled" and that MBUSA needed new and less

financially powerful dealers.

**COUNT I**
**Breach of Right of First Refusal**

34.     Plaintiffs reallege paragraphs 1 through 33 as is fully set forth herein.

35.     Both the May 15, 1996 Agreement and the July 16, 1999 Agreement contained

rights of first refusal that expired on or about May 31, 2003.

36.     Upon information and belief, MBUSA determined to establish an additional

Mercedes-Benz dealership within the Detroit Metropolitan Market Area prior to May 31, 2003.

37.     Once MBUSA made the determination to establish an additional point, it was

obligated to offer Estate Motors (by virtue of the May 15, 1996 Agreement) and the

Ghesquieres (pursuant to the July 16, 1999 Agreement) the opportunity, pursuant to their rights

of first refusal, to establish that dealership.

38.     Upon information and belief, MBUSA entered into discussions to establish an

additional dealership with one or more third parties, and possibly others, prior to May 31,

2003.

39.     The aforementioned actions by MBUSA constitute a breach of the rights of first

refusal contained in the May 15, 1996 and July 16, 1999 Agreements.

-10-

40.     Plaintiffs Estate Motors, and the Ghesquieres, have been substantially damaged by MBUSA's breach.

## COUNT II
## Breach of Express Covenant of Good Faith and Fair Dealing

41.     Plaintiffs reallege paragraphs 1 through 40 as is fully set forth herein.

42.     An express covenant has been made by MBUSA to act in good faith towards the Dealerships.

43.     The express covenant is contained in paragraph XIII of the Mercedes-Benz Passenger Car Dealer Agreement, which provides as follows:

> In the interest of maintaining a harmonious relationship between MBUSA and Dealer, if Dealer believes that MBUSA has breached this Agreement or has failed to act in good faith toward Dealer, Dealer shall report its belief and the bases therefor promptly, in writing, to the President or a Vice President of MBUSA. For the purposes of this Section XIII, the term "good faith" shall mean MBUSA and its representatives acting in a fair, honest, commercially reasonable, equitable, and impartial manner toward Dealer. It is the intention of the parties that the purpose of the requirement of such notification by Dealer is to afford MBUSA sufficient opportunity to consider the claim of Dealer and if, in the sole determination of MBUSA, such claim is found to be meritorious, to undertake such measures as may be necessary to correct the condition of which Dealer complains.

44.     On or about August 15, 2005, the Plaintiffs informed MBUSA, in writing to Paul Halata, President of MBUSA, that MBUSA had not acted in good faith as required by the Franchise Agreements.

45.     Upon information and belief, MBUSA had conducted a market study prior to May 31, 2003, to determine whether an additional dealership in the Detroit Metropolitan Market area was warranted.

46.     Upon information and belief, that market study led, or should have led, to a determination by MBUSA that a new dealership be located in the Detroit Metropolitan Market area.

47.     In the event that MBUSA did not make, or did not even attempt to make, the determination to establish an additional dealership in the Detroit Metropolitan Market prior to May 31, 2003, its failure to do so represents a breach of its express covenant to act in good faith.

48.     MBUSA also breached its covenant of good faith (1) by failing to permit Plaintiffs the opportunity to receive the benefit of the right of first refusal Plaintiffs bargained for; (2) by providing Plaintiffs with false and deceptive information regarding the Detroit market and MBUSA's plans to expand in that market; (3) by threatening Plaintiffs with commercial retaliation if Plaintiffs attempted to exercise their rights under the contract; and (4) by abusing the great discretion reserved to MBUSA under Section II, subpart E of the Franchise Agreements and failure to reasonably exercise its discretion by adding a new dealer in the Dealers' Area of Influence (AOI).

49.     MBUSA wilfully and recklessly committed the acts referenced in the preceding paragraphs with the express desire to benefit unjustly, to the detriment of Plaintiffs, resulting in damage to Plaintiffs.

50.     To the extent that it is determined that MBUSA has not made an express covenant of good faith and fair dealing, it still has breached the Franchise Agreements, the May 15, 1996 Agreement and the July 16, 1999 Agreement by failing to abide by an implied covenant of good faith and fair dealing.

-12-

## COUNT III
## Unlawful Modification of Franchise Agreement

51.   Plaintiffs reallege paragraphs 1 through 50 as is fully set forth herein.

52.   Both the Passenger Car and Light Truck Dealer Agreements entered into between the Dealers and MBUSA contain the provision that "[a]ll terms and conditions of this agreement inconsistent with the laws and rules with the State of Florida are of no force and effect."

53.   In Section II.E of the Franchise Agreement Standard Provisions, MBUSA has attempted to define the Dealer's Area of Influence ("AOI"). In doing so the Franchise Agreements provide that:

> MBUSA may alter or adjust dealer's AOI at any time. The AOI is a tool used by MBUSA to evaluate dealer's performance of its primary obligations hereunder. **Dealer agrees that it has no right or interest in any AOI and that MBUSA may add new dealers to or relocate dealers into dealer's AOI.** Any such addition or relocation of a dealer will result in an alteration or adjustment of dealer's AOI. (emphasis added).

54.   The contents of Section II.E of the Franchise Agreement Standard Provisions is in direct contravention of Florida law, which does provide a dealer with a right to protest any modifications to its franchise agreement.

55.   Specifically, the Florida Motor Vehicle Licenses Act provides that:

> A modification or replacement [of a franchise agreement] is unfair if it is not clearly permitted by the franchise agreement; is not undertaken in good faith; or is not undertaken for good cause. The [manufacturer or distributor] shall have the burden of proof that such action is fair and is not prohibited.

Fla. Stat. ch. 320.641(1)(3).

-13-

56.     The burden of proving that a modification is not fair and unprohibited lies upon the manufacturer.

57.     MBUSA has breached the terms of its franchise agreement with one or more of the Plaintiffs by proposing to add an additional dealership into an existing Area of Influence and consequently changing the Area of Influence of one or more other dealers without taking into proper consideration the rights or interests in the existing market or other equitable factors.

58.     MBUSA's actions are unfair, and taken without good cause or in good faith and, therefore, contravene Florida law and the Franchise Agreements.

**COUNT IV**
**<u>Breach of Implied Covenant of Good Faith and Fair Dealing</u>**

59.     Plaintiffs reallege paragraphs 1 through 58 as is fully set forth herein.

60.     By virtue of the May 15, 1996 Agreement, the July 16, 1999 Agreement and the Franchise Agreements, there has arisen between MBUSA and the Plaintiffs an implied covenant of good faith and fair dealing.

61.     MBUSA's actions complained of herein constitute a breach of the implied covenant of good faith and fair dealing inherent in the May 15, 1996 Agreement, the July 16, 1999 Agreement and the Franchise Agreements.

62.     All of the Plaintiffs have been damaged as a result of MBUSA's breach of the implied covenant of good faith and fair dealing.

## COUNT V
## Unjust Enrichment

63.     Plaintiffs reallege paragraphs 1 through 62 as is fully set forth herein.

64.     The Plaintiffs expended approximately $1.5 million to purchase the Wood Motors Mercedes-Benz dealership.

65.     MBUSA profited by the purchase of the Wood dealership in that it was able to close that point without protest by the existing dealer. Because the existing dealer's assets were acquired by Estate Motors, Wood Motors was without its right to protest the closing of the dealership.

66.     Likewise, MBUSA's ability to open a new dealership in northeast Detroit is as a direct result of the Plaintiffs' participation in closing the Wood Motors dealership. MBUSA would not otherwise be able to open this new dealership just 2 miles from the prior Wood Motors dealership location. The Wood Motors dealership would have had a right to protest the addition of the new dealership, thus preventing its opening.

67.     MBUSA has retained the benefit of the Plaintiffs' participation in closing the Wood dealership without providing just compensation to the Plaintiffs. MBUSA has specific knowledge of the benefits conferred to it by the Plaintiffs and has voluntarily accepted and retained such benefits. It is inequitable for MBUSA to retain the benefit of the Plaintiffs' participation in closing the Wood dealership while appointing a new dealer in the same area without MBUSA paying to Plaintiffs the fair value of that benefit.

68.     MBUSA has been unjustly enriched at the expense of the Plaintiffs and the Plaintiffs have suffered significant damage as a result.

-15-

WHEREFORE, Plaintiffs demand judgment against Defendant MBUSA as follows:

1.   The Dealerships seek damages for MBUSA's breach of the terms of their Franchise Agreements;

2.   All Plaintiffs seek damages for MBUSA's breach of the rights of first refusal provision contained in the May 15, 1996 Agreement;

3.   Estate Motors, Manor Motorcar and the Ghesquieres seek damages for MBUSA's breach of the rights of first refusal provision contained in the July 16, 1999 Agreement;

4.   All Plaintiffs seek damages for MBUSA's breach of the implied covenant of good faith and fair dealing;

5.   Estate Motors and the Ghesquieres seek damages for unjust enrichment;

6.   All Plaintiffs seek permanent injunctive relief disallowing MBUSA from authorizing an additional dealership in the Detroit Metropolitan Market area without first giving Estate Motors and/or the Ghesquieres a right of first refusal on that additional dealership;

7.   The costs of this action;

8.   Interest and attorney fees as allowed by law; and

9.   Such other relief as this Court deems just and proper.

Respectfully submitted this the __ __ day of October, 2005.

**WILLINGHAM & COTE , P.C.**

By: _____

Raymond J. Foresman
MI State Bar No.: 13574
Jason W. Johnson
MI State Bar No.: 49033
333 Albert Street, Suite 500
East Lansing, Michigan 48823
Telephone: 517-351-6200
Facsimile: 517-351-1195

**MYERS & FULLER, P.A.**
Shawn D. Mercer
NC State Bar No.: 19182
Frank X. Trainor, III
NC State Bar No.: 26161
Post Office Box 97275
Raleigh, North Carolina 27615
Telephone: 919-847-8632
Facsimile: 919-847-8633
*Attorneys for Plaintiffs*



Mercedes-Benz

Mercedes-Benz
of North America, Inc.

May 15, 1996

Chuck Ghesquire, President
Estate Motors, Ltd.
1350 N. Woodward Avenue
Bloomfield Hills, MI 48304

Re: <u>**Detroit, Michigan**</u>

Dear Mr. Ghesquire:

This letter sets forth the agreement (the "Agreement") between Mercedes-Benz of North America, Inc., a Delaware corporation ("MBNA") and Estate Motors, Ltd., a Michigan corporation ("Estate") concerning MBNA's purchase of certain assets of Wood Motors, ("Wood") the Mercedes-Benz dealership in Detroit, MI ("Detroit Acquisition").

In reliance upon your agreement to accept an assignment of certain of MBNA's rights to purchase the assets of Wood as set forth in the attached Asset Purchase Agreement, (the "Purchase Agreement"), MBNA is entering into an agreement with Wood Motors, Inc. ("Wood") and its Shareholders (the "Shareholders") to purchase certain assets of the dealership. A copy of the Purchase Agreement is attached hereto and made a part hereof as Exhibit "A".

Estate and MBNA hereby agree as follows:

1.   Estate herewith accepts MBNA's assignment of certain of its (MBNA) rights under the Purchase Agreement and the Non-Competition Agreement (the "Non-Competition Agreement") attached hereto as Exhibit "A" as follows:

   A.   Purchase Agreement

   (1)   Sections 2.3, 2.4, 2.5 and 5.5 of the Purchase Agreement as more fully set forth below:

   (a)   Certain Assets of Wood as of Closing Date, including Fixed Assets, M-B customer lists, literature and customer service files, and the Non-Competition Agreement by Wood and the Shareholders at the price of Three thousand ($3,000.) dollars as set forth in the Purchase Agreement. Estate further agrees to pay to Wood the sum of One million three hundred ninety-seven

Address:
One Mercedes Drive, P.O. Box 350
Montvale, NJ 07645 0350

Telephone: (201) 573-0600
Telefax:    (201) 573-0117

Cable:
Mercebenz Mtle

Overseas Telex 135
Domestic Telex 135

EXHIBIT

A

Chuck Ghesquire, President
Estate Motors, Ltd.
May 15, 1996
Page 2

thousand ($1,397,000.) dollars for the voluntary
termination of the Wood Mercedes-Benz Passenger Car
Dealer Agreement.  MBNA shall pay the remaining Two
million eight hundred fifty thousand ($2,850,000.)
dollars to Wood for the voluntary termination of the
Mercedes-Benz Passenger Car Dealer Agreement.

(b)All New Mercedes-Benz Passenger Cars in Wood's
inventory as of the Closing Date as set forth in
Schedule 2.3(b) of and at the price set forth in the
Purchase Agreement.

(c)  Certain Used Mercedes-Benz passenger cars in
Wood's inventory as of the Closing Date as set forth on
Schedule 2.3(c) of and at the price set forth in the
Purchase Agreement provided however, that the sum of
the Used Vehicles purchased shall not exceed Seven
hundred thousand ($700,000.) dollars.

(d) All demonstrator and service Mercedes-Benz
Passenger Cars in Wood's inventory as of the Closing
Date as set forth in Schedule 2.3(d) at the price set
forth in the Purchase Agreement.

(e) Not applicable.

(f) Not applicable.

(g) All Fixed Assets as set forth in Schedule 2.3(g),
the price of which is included above.

(h  All deposits taken by Wood in connection with the
sale of New Mercedes-Benz Passenger Cars which have not
been delivered as of the Closing Date.

2.   All sums payable to Wood and the Shareholders pursuant
     to this Agreement shall be payable as of the Closing
     Date.  All assets to be acquired by Estate, pursuant to
     this Agreement, shall be free and clear of all liens
     and encumbrances.

3.   It is agreed that Estate assumes no other obligations
     of MBNA under the  Purchase Agreement except as
     expressly provided herein.

Chuck Ghesquire, President
Estate Motors, Ltd.
May 15, 1996
Page 3

4.   It is further understood between the parties that
     Estate will not assume any obligations under the
     Mercedes-Benz Passenger Car Dealer Agreement between
     MBNA and Wood, which Dealer Agreement is to be
     voluntarily terminated by Wood as of the Closing Date.

5.   The closing of this Agreement (the "Closing") shall
     take place on the same date and contemporaneously with
     the closing of the  Purchase Agreement (the "Closing
     Date").  The parties agree that as a condition of
     closing this Agreement, Estate requires (A) approval of
     its application for a Mercedes-Benz Passenger Car
     Dealer Agreement for a mutually agreeable location in
     the Detroit area to be issued within 18 months of
     Closing provided Estate is in compliance with all
     material terms of this Agreement; (B) the commitment of
     MBNA to provide Estate the right to acquire the
     Mercedes-Benz Light Truck Agreement at the time said
     agreements shall be issued for its Bloomfield Hills
     location and the new Farmington Hills area location,
     provided that Estate meets all then existing
     requirements for all authorized Mercedes-Benz dealers
     for said agreements; (C) the representations and
     warranties of MBNA contained herein shall be true and
     correct on and as of the Closing Date; and (D) that all
     of the conditions to closing the  Purchase Agreement
     have been met without waiver, amendment or
     modification.

6.   Estate also agrees to provide MBNA no later than May
     20, 1996, with written proof reasonably satisfactory to
     MBNA that Estate has obtained the appropriate financing
     to complete the transactions contemplated herein.

     It is agreed by MBNA and Estate that due to the nature
     of the transactions involved herein that time is of the
     essence.

7.   Estate shall within six months of the written request
     of MBNA, establish a Customer Convenience Center
     ("CCC") at a mutually agreeable site within the East
     Detroit area.

     Estate shall comply with all reasonable directives of
     MBNA with respect to establishing and operating such

Chuck Ghesquire, President
Estate Motors, Ltd.
May 15, 1996
Page 4

Customer Convenience Center.

8. Estate shall within eighteen (18) months from date of
Closing, establish a new Mercedes-Benz sales and
service facility at a mutually satisfactory site in the
general vicinity of Farmington Hills, MI area ("New
Facility").

Estate agrees the New Facility will be an exclusive
Mercedes-Benz dealership.  Estate agrees that the New
Facility will meet all of the MBNA minimum standard
requirements as set forth in MBNA's Dealer Facility
Guide and will comply with all of the financial
standards and other DORA requirements as set forth by
MBNA.  Estate further agrees to abide by MBNA's
decision with respect to the requirements for this new
facility as reasonably exercised by MBNA.

In the event MBNA determines to establish an additional
Mercedes-Benz passenger car dealer and/or light truck
dealer in the Detroit area, MBNA herewithgrants to
Estate a right of first refusal to establish such
dealership.  The term of this right of first refusal
shall be for a period of seven (7) years from the date
of closing.

9. MBNA further agrees to provide Estate, upon
commencement of operations at the New Facility, all
routine start-up assistance provided by MBNA to its
authorized dealers.

MBNA agrees to provide Estate, upon closing of the Wood
Acquisition, the Estimated Dealer Allocation (EDA) of
Wood consisting of 15 Mercedes-Benz passenger cars per
month, plus an additional 5 Mercedes-Benz passenger
cars per month for a total of 20 Mercedes-Benz
passenger cars per month, for the remainder of the
calendar year 1996.  The EDA for calendar year 1997
shall be 680 Mercedes-Benz passenger cars.

Upon commencement of operations at the New Facility,
MBNA shall recalculate the EDA of Estate for the
Bloomfield Hills dealership while establishing a new
EDA for the New Facility.  Provided Estate demonstrates
the ability to sell the increased volumes, the new EDA

Chuck Ghesquire, President
Estate Motors, Ltd.
May 15, 1996
Page 5

for both dealerships (Estate and New Facility) shall be based upon the greater of the National average or Regional average for the new Areas of Influence in the Detroit metro market for each dealership, but at the time of this initial calculation shall be no less than 850 Mercedes-Benz passenger cars. The allocation of Mercedes-Benz passenger cars between the Bloomfield Hills dealership and New Facility shall be mutually agreed upon between MBNA and the delers. Thereafter, the EDA of Estate and the New Facility shall be based upon the then current EDA policy of MBNA.

10. Except as expressly provided herein, MBNA shall not be under any liability whatsoever for any expenditure made or incurred by Estate in connection with the performance of its obligations pursuant to this Agreement.

11. Estate and MBNA agree that each party shall keep this Agreement as well as MBNA's negotiations with Wood strictly confidential and shall not disclose any information with respect thereto to any third party, except for legal, financial and other advisors and to initiate steps to commence full operations at the Detroit dealership location upon the Closing Date. Failure to comply with this paragraph shall be deemed a material breach of this Agreement.

12. Except as otherwise provided herein, this Agreement may not be assigned or transferred by Estate without the prior written consent of MBNA, which consent shall be at the sole discretion of MBNA. The parties acknowledge that Estate may establish a new corporate entity ("New Entity") to own and operate the New Facility.

Estate further agrees that it will not assign or transfer the Mercedes-Benz Passenger Car Dealer Agreement to be executed between MBNA and Estate or theNew Entity for a period of thirty-six (36) months from the date of issuance of the M-B Dealer Agreement for the New Facility. In connection with this restriction, the parties agree that the term assignment shall also include any transfer or sale of the principal assets or transfer or sale of any ownership

Chuck Ghesquire, President
Estate Motors, Ltd.
May 15, 1996
Page 6

> interest as referred to in the Mercedes-Benz Dealer
> Agreement between MBNA and Estate except as may be
> required by financial institutions for granting a
> security interest in such items.

13. This Agreement may be modified only by a written
    instrument signed by an authorized officer of each
    party hereto, which for MBNA shall be a Vice President
    of the company.  This Agreement sets forth all of the
    promises, covenants, agreements, conditions and
    undertakings between the parties hereto with respect to
    the transactions contemplated herein and supersedes all
    prior and contemporaneous agreements or understandings,
    whether written, oral or implied.

14. Estate and MBNA acknowledge that each other has no
    liability for any employee benefit plans or other plans
    with respect to the current or former employees of
    Wood. MBNA shall have no liability with respect to any
    of the employees of either Wood or Estate.

15. Estate and MBNA, by signing this Agreement, acknowledge
    that each has been afforded a full opportunity to
    review and reflect on the terms and conditions of this
    Agreement and the advice of financial and other
    advisors of their choice which advice they have been
    encouraged to obtain.  Each party  further acknowledges
    it has read and understands this Agreement.  Each
    party, except as expressly provided herein, further
    waives any and all claims whether, statutory or
    otherwise, it might have in connection with any
    undertakings stated herein against each other and/or
    any of its affiliated companies and hereby releases
    each other and/or any of its affiliated companies and
    their respective directors, officers and employees from
    any and all liability with respect thereto except as
    expressly provided herein.  Estate further warrants and
    represents to MBNA: (A) that the persons executing this
    letter on behalf of Estate are authorized to enter into
    this Agreement; (B) Estate is a corporation duly
    organized, validly existing and in good standing under
    the laws of the State of Michigan (C) Estate has the
    requisite authority to enter into this Agreement and
    carry out the provisions hereof; and (D) this Agreement
    and all other agreements executed by Estate hereto are

Chuck Ghesquire, President
Estate Motors, Ltd.
May 15, 1996
Page 7

enforceable against Estate in accordance with their
respective terms except as may be limited by operation
of law.

MBNA represents and warrants to Estate: (A) MBNA is a
corporation duly organized, validly existing and in
good standing under the laws of the State of Delaware;
(B) MBNA has the requisite power and authority to enter
into this Agreement and to carry out the provisions
hereof; (C) this Agreement and all other agreements
executed by MBNA hereto are enforceable against MBNA in
accordance with their respective terms except as may be
limited by operation of law; (D) the persons executing
this Agreement on behalf of MBNA are authorized to
enter same; and (E) MBNA has not assigned any of its
rights or obligations under the  Purchase Agreement.

16. Both parties recognize that in the event of a material
breach of this Agreement, each may suffer a loss of
special and unique benefits which are of a peculiar
value which monetary damages may not be sufficient or
adequate to address and agree that a material breach of
any provision of this Agreement may cause  irreparable
injury and damages.  Therefore, the parties expressly
agree that each shall be entitled to obtain injunctive
and other equitable relief for a breach of any material
terms and conditions of this Agreement.

17. MBNA herewith agrees to indemnify and hold harmless
Estate and its parent, subsidiaries and affiliated
entities and their officers, directors and employees
from any and all claims, losses or expenses (including
reasonable attorney's fees) resulting in any way from
(i) Wood's or the Shareholder's termination of the
business conducted at Detroit, sale of assets or
performance of their obligations contained in the
Purchase Agreement; (ii) any misrepresentations, breach
of warranty or non-fulfillment of any agreement on the
part of MBNA contained in this Agreement.

Chuck Ghesquire, President
Estate Motors, Ltd.
May 15, 1996
Page 8


If the foregoing is satisfactory, kindly execute where indicated.


MERCEDES-BENZ OF NORTH AMERICA, INC.

By: _____
    Mike Jackson
    Executive Vice President

By: _____
    Walter Anderson
    Vice President, Chicago Region

ATTEST: _____
    Anthony P. La Spada
    Assistant Secretary


Acknowledged and Agreed to:

ESTATE MOTOR CARS

By: _____

    _____
    (Print Name)

    _____
    Title

ATTEST: _____


5/15/96
estate.det



Mercedes-Benz

Mercedes-Benz USA, Inc.
Chicago Region

July 16, 1999

Estate Motors, Ltd.
36600 N. Woodward Avenue
Bloomfield Hills, MI 48304

Manor Motorcar Co.
39500 Grand River Avenue
Novi, MI 48375

Re:    Detroit Metropolitan Market

Gentlemen:

This is to confirm the agreement between MBUSA and Estate Motors, Ltd. of Bloomfield Hills, MI ("Estate"); Manor Motorcar Co. of Novi, MI ("Manor") as well as Charles Ghesquiere, Jr., Lee Ghesquiere and C. J. Ghesquiere (collectively, the "Ghesquieres") concerning the establishment of an additional Mercedes-Benz Center in the Detroit Metropolitan Market.

Whereas, MBUSA has reasonably determined that the Detroit Metropolitan Market requires the establishment of an additional full sales and service Mercedes-Benz Retail Center to adequately and properly service the Mercedes-Benz clients in this area;

Whereas, the Ghesquieres are owners of all outstanding shares of both Estate and Manor, the authorized Mercedes-Benz Centers in Bloomfield Hills and Novi, respectively;

Whereas, the Ghesquieres have made inquiry to MBUSA as to the availability of obtaining said additional Mercedes-Benz Center in the Detroit Metropolitan Market and are prepared to establish the Mercedes-Benz Center in accordance with MBUSA's directives.

In consideration of the foregoing, MBUSA agrees to grant to the Ghesquieres the right to establish an additional full sales and service Mercedes-Benz Center (both passenger car and light truck) in the Detroit Metropolitan Market in accordance with the following terms and conditions:

1.    The Ghesquieres agree to establish a new full sales and service Mercedes-Benz Center ("New Facility") in the Rochester Hills, MI area and to commence operations by no later than June 30, 2001. Said New Facility shall be established at property adjoining 555 Rochester Road provided facility plans are developed that are satisfactory to MBUSA and meet all of MBUSA's standard requirements. This shall be an exclusive Mercedes-Benz facility.

9399 W. Higgins Road, Suite 210, Rosemont, IL 60018, Phone (847) 384-4600, Fax (847) 384-4610
www.MBUSA.com

**EXHIBIT**

B

Estate Motors, Ltd. and
Manor Motorcar Co.
July 16, 1999
Page 2

The Ghesquieres agree to abide by MBUSA's reasonable decision with respect to the requirements for this New Facility. MBUSA shall issue to the Ghesquieres or the business entity to be formed by the Ghesquieres, both Mercedes-Benz Passenger Car and Light Truck Dealer Agreements for the Rochester Hills location.

2.  Additionally, the Ghesquieres will at a mutually agreed upon time, establish a Mercedes-Benz Service Center at a mutually agreeable site within the Detroit market. This Service Center shall be established in accordance with MBUSA's current guidelines as to facility and financial requirements.

3.  Estate Motors Ltd. agrees to adopt the d/b/a of "Mercedes-Benz of Bloomfield Hills" and agrees to purchase the appropriate corporate identification package (fascia) identifying the Center as "Mercedes-Benz of Bloomfield Hills". Both will take place within six (6) months of the date of this agreement. Given the age of the existing corporate identification, there will be no reimbursement by MBUSA.

4.  Manor Motorcar Co. agrees to adopt the d/b/a of "Mercedes-Benz of Novi" and agrees to purchase corporate identification (fascia) identifying the Center as "Mercedes-Benz of Novi". Both will take place within six months of the date hereof. MBUSA agrees to reimburse Manor for 90% of the cost of the original corporate identification which will be replaced.

5.  The Ghesquieres agree that the Rochester Hills facility shall utilize the name of "Mercedes-Benz of Rochester Hills" upon commencement of operations and shall have all required corporate identification designating "Mercedes-Benz of Rochester Hills" including but not limited to signs.

6.  In the event MBUSA determines to establish an additional Mercedes-Benz retail center in the Detroit Metropolitan Market, MBUSA herewith grants to the Ghesquieres a right of first refusal to establish such center. The term of this right of first refusal expires May 31, 2003.

7.  Estate, Manor and the Ghesquieres agree none of the three Mercedes-Benz Centers (Bloomfield Hills, Novi or Rochester Hills) or any interest therein shall be sold or otherwise transferred before May 31, 2003 without the prior express written approval of MBUSA.

8.  Estate, Manor and the Ghesquieres further agree to establish Saturday hours at all three locations as well as a potential Service Center and each location will be open for not less than four hours. It is agreed that these Saturday hours shall be for a minimum of one year

Estate Motors, Ltd. and
Manor Motorcar Co.
July 16, 1999
Page 3

at which time the results from these additional hours will be analyzed by MBUSA together with each separate retailer. There will be similar reviews performed annually with each retailer.

9. Estate, Manor and the Ghesquieres agree to comply with all TME guidelines as may be issued by MBUSA at all three locations. Each retailer will establish negotiation free processes for new and pre-owned vehicle sales as well as provide negotiation free service menus. MBUSA reserves the right to utilize mystery shoppers to monitor compliance with this provision.

10. Estate, Manor and the Ghesquieres agree to conduct separate advertising and marketing for all three points. All advertising will be in compliance with the then current MBUSA guidelines.

11. Each retailer shall meet or exceed the lesser of national or regional average in the following areas:

> New car penetration
> CRI
> Starmark sales as a percentage of new sales

The Rochester Hills point will have 24 months to meet these standards.

12. Initial planning volume for the Rochester Hills point will be 600 vehicles. This volume will be divided between the models (light truck and passenger cars) in accordance with the then current production plan and MBUSA's current allocation formula. This initial allocation will not come from the allocation of either Estate or Manor. Thereafter the allocations of Estate, Manor, and Rochester Hills will be based upon the then current allocation policy of MBUSA.

13. The Ghesquieres further agree to appoint C. J. Ghesquiere as the Owner/Operator of the Mercedes-Benz Center in Rochester Hills and he shall be devoted full time to the operations at this location. In addition, Estate and Manor will maintain a full time owner/operator.

14. If any retailer (Bloomfield Hills, Novi and Rochester Hills) are not in compliance with any of the terms and conditions of this agreement or respective Dealer Agreements, MBUSA reserves the right to exclude the retailer from receiving any additional vehicles above the base allocation for said retailer until it can be reasonably demonstrated that the retailer is back in compliance with said requirements.

3

Estate Motors, Ltd. and
Manor Motorcar Co.
July 16, 1999
Page 4

15. Except as expressly provided herein, MBUSA shall not be under any liability whatsoever
for any expenditure made or incurred by Estate, Manor or the Ghesquieres in connection
with the performance of their obligations pursuant to this agreement.

16. Estate, Manor and the Ghesquieres and MBUSA agree that each party shall keep this
agreement strictly confidential and shall not disclose any information with respect thereto
to any third party whomsoever, except as may be required by them to legal, financial, and
business professionals to meet their obligations herewith. The parties agree that any
notices to the general public or other public disclosure of this agreement shall be
reviewed by each party prior to such disclosure. Failure to comply with this section shall
be deemed a material breach of this agreement.

17. Estate, Manor and the Ghesquieres, by signing this agreement, acknowledge that each
entity and individual has been afforded a full opportunity to review and reflect on the
terms and conditions of this agreement and seek legal, financial and other advisors of
their choice which advice they have been encouraged to obtain. Each party further
acknowledges it has read and understands this agreement and further waives any and all
claims whether, statutory or otherwise, it might have in connection with any undertakings
stated herein against MBUSA and/or any of its affiliated companies and their respective
directors, officers and employees from any and all liability with respect thereto except as
expressly provided herein. Each party further warrants and represents to MBUSA that the
persons executing this agreement are authorized to enter into same.

18. All parties recognize that in the event of material breach of this agreement, each may
suffer a loss of special and unique benefits which are of a peculiar value which monetary
damages may not be sufficient or adequate to address and agree that a material breach of
any provision of this agreement may cause irreparable injury and damages. Therefore, the
parties expressly agree that each shall be entitled to obtain injunctive and other equitable
relief for a breach of any material terms and conditions of this agreement.

19. This letter fully sets forth all terms and conditions between MBUSA, Estate, Manor and
the Ghesquieres relative to its right to establish an additional Mercedes-Benz Center in
the Detroit Metropolitan Market.

If the foregoing is satisfactory, kindly execute where indicated and return one original to Mr.
Steve Smith at the Chicago Region office.

MERCEDES-BENZ USA, INC.

By: _____
Joe Eberhardt
Vice President - Marketing

By: _____
Walter Anderson
General Manager, Chicago Region

Date: _____8/19/99_____

ATTEST: _____
A. P. La Spada, Assistant Secretary

Acknowledged and Agreed to:

ESTATE MOTORS, LTD.

By: _____

MANOR MOTORCAR CO.

By: _____

CHARLES GHESQUIERE, Individually

By: _____

LEE GHESQUIERE, Individually

By: _____

C. J. GHESQUIERE, Individually

By: _____

# MERCEDES-BENZ USA, LLC

## MERCEDES-BENZ PASSENGER CAR DEALER AGREEMENT
## STANDARD PROVISIONS

### I.  ACQUISITION, DELIVERY AND INVENTORY OF MERCEDES-BENZ PASSENGER CAR PRODUCTS

#### A.  PRICES AND TERMS OF SALE

MBUSA shall offer to sell to Dealer and Dealer shall have the right to purchase from MBUSA Mercedes-Benz Passenger Car Products in accordance with the provisions of this Agreement and the prices and other terms of sale that MBUSA shall establish and revise from time to time.  Such revised prices or terms shall apply to any Mercedes-Benz Passenger Car Product not invoiced to Dealer by MBUSA at the time the notice of such change is given to Dealer (in the case of Mercedes-Benz Passenger Cars), or upon issuance of a new or modified parts price list or through change notices, letters, bulletins or revision sheets (in the case of Genuine Mercedes-Benz Passenger Car Parts and Accessories), or at such other times as may be designated in writing by MBUSA.

#### B.  AVAILABILITY AND ALLOCATION OF PRODUCTS

MBUSA will allocate Mercedes-Benz Passenger Car Products among its passenger car dealers in a fair and equitable manner.  MBUSA will, upon Dealer's request, explain the considerations and method used to allocate Mercedes-Benz Passenger Car Products to Dealer.

#### C.  DELIVERY OF PRODUCTS

MBUSA will ship Mercedes-Benz Passenger Car Products to Dealer by whatever mode of transportation, by whatever route, and from whatever point MBUSA may select.  Dealer shall pay MBUSA such charges as MBUSA in its sole discretion establishes for such transportation services.

#### D.  PASSAGE OF TITLE

Title to each Mercedes-Benz Passenger Car Product shall pass from MBUSA to Dealer, or to the financial institution designated by Dealer, upon MBUSA's receipt of payment for said Product and upon delivery of said Product to Dealer or to a carrier for transportation to Dealer.

EXHIBIT

C

**E.  RISK OF DAMAGE OR LOSS**

Dealer shall bear the risk of damage to or loss of Mercedes-Benz Passenger Car Products during transportation from the point of shipment; however. MBUSA will, if requested by Dealer in such manner and within such time as MBUSA may specify, prosecute claims for damage to or loss of Mercedes-Benz Passenger Cars during said transportation against the responsible carrier for and on behalf of Dealer. To the extent required by law, Dealer shall notify the purchaser of a vehicle of any damage sustained by such vehicle prior to sale.

**F.  DELAY OR FAILURE OF DELIVERY**

MBUSA shall not be liable for delay or failure to deliver Mercedes-Benz Passenger Car Products that it has previously agreed to deliver, where such delay or failure to deliver is the result of any event beyond the control of MBUSA, including but not limited to any law or regulation of any governmental entity, acts of God, foreign or civil wars, riots, interruptions of navigation, shipwrecks, fires, floods, storms, strikes, lockouts, or other labor troubles, embargoes, blockades, or delay or failure of DCAG to deliver Mercedes-Benz Passenger Car Products.

**G.  DIVERSION AND STORAGE CHARGES**

Dealer shall be responsible for and shall pay all charges for demurrage, storage and other expense accruing after shipment to Dealer or to a carrier for transportation to Dealer. If diversions of shipments are made upon Dealer's request or are made by MBUSA as a result of Dealer's failure or refusal to accept shipments made pursuant to Dealer's orders, Dealer shall pay all additional charges and expenses incident to such diversions.

**H.  SECURITY INTEREST**

**1.  Grant of Security Interest**

As security for the full payment of all sums from time to time owed by Dealer to MBUSA under this Agreement. whether such sums are now or hereafter become due and owing. Dealer hereby grants to MBUSA a security interest in the following items for which MBUSA has not received payment (collectively referred to as "Collateral"):

(i)  All Genuine Mercedes-Benz Passenger Car Products and other related items delivered by MBUSA to Dealer hereunder on account (all such inventory hereinafter referred to collectively as "Inventory" and individually as "Item of Inventory"); and

(ii)  All proceeds from any of the foregoing. including without limitation, insurance payable by reason of the loss. damage or

destruction of any Item of Inventory; and all accounts and chattel paper of Dealer arising from its sale, lease or other disposition of Inventory now existing or hereafter arising, and all liens, securities, guarantees, remedies and privileges pertaining thereto, together with all rights and liens of Dealer relating thereto.

**2.     Default in Payment**

Dealer shall be in default of this Section I.H if: (i) Dealer shall fail to pay any amounts secured hereby when due or fail to perform any obligations under this Section I in a timely manner; (ii) there shall occur any material adverse change in the financial condition of Dealer; or (iii) Dealer shall dissolve or become insolvent or bankrupt; and, in any such case, MBUSA may declare all sums secured by this Section I.H immediately due and payable and MBUSA shall have all the rights and remedies afforded to a secured party after default under the Uniform Commercial Code or other applicable law in effect on the date of this Agreement.

**3.     Assembly of Collateral, Payment of Costs and Notices**

Dealer shall, if requested by MBUSA upon the occurrence of any default under Section I.H.2, assemble the Collateral and make it available to MBUSA at a place or places designated by MBUSA. Dealer also shall pay all costs of MBUSA, including without limitation, attorneys fees incurred with respect to the enforcement of any of MBUSA's rights under this Section I.H.

**4.     Recording and Further Assurances**

Dealer shall provide any assistance necessary in the preparation of financing statements and such other instruments or documents and take any other action as MBUSA may request in order to create or maintain the security interest intended to be created by this Section I.H, or to enable MBUSA to exercise and enforce its rights hereunder. A carbon, photographic or other reproduction of this Agreement shall be sufficient as a financing statement and may be filed in lieu of a financing statement in any and all jurisdictions which accept such reproductions.

**5.     Records and Schedules of Inventory**

Dealer shall keep accurate records itemizing and describing the kind, type and quantity of Inventory and shall furnish to MBUSA within five (5) days of receipt of MBUSA's request therefor, a current schedule of inventory in form and substance satisfactory to MBUSA ("Schedule of Inventory"), which shall be true and accurate in all respects. A physical inventory shall

be conducted no less than annually in connection with preparation of year-end financial statements of Dealer and, at MBUSA's request, a report of such inventory shall be promptly provided to MBUSA.

## I.  CHANGES OF DESIGN, SPECIFICATIONS OR OPTIONS

MBUSA may change the design or specifications of any Mercedes-Benz Passenger Car Product or the options in any Mercedes-Benz Passenger Car Product and shall be under no obligation to provide notice of same or to make any similar change to Mercedes-Benz Passenger Car Products previously purchased by or shipped to Dealer.  No change shall be considered a model year change unless so specified by MBUSA.

## J.  DISCONTINUANCE OF MANUFACTURE OR IMPORTATION

DCAG and/or MBUSA may discontinue the manufacture, importation or distribution of all or part of any Mercedes-Benz Passenger Car Product, whether passenger car parts, options or accessories, including any model, series or body style of any Mercedes-Benz Passenger Car at any time without any obligation or liability to Dealer by reason thereof.

## K.  MINIMUM VEHICLE INVENTORIES

Dealer agrees that it shall, at all times, maintain in showroom ready condition at least the minimum inventory of Mercedes-Benz Passenger Cars that may be established by MBUSA from time to time.

## L.  PRODUCT MODIFICATIONS

Dealer agrees that it will not install aftermarket accessories or make any modifications to Mercedes-Benz passenger cars that may impair or adversely affect their safety, emissions, structural integrity or performance.

## II.  DEALER'S MARKETING AND SALES OF MERCEDES-BENZ PASSENGER CAR PRODUCTS

## A.  DEALER'S GENERAL RESPONSIBILITIES

Dealer recognizes that customer satisfaction and the successful promotion and sale of Mercedes-Benz Passenger Car Products are significantly dependent on Dealer's advertising and sales promotion activities.  Therefore, Dealer at all times shall:

1.  Actively and effectively promote and sell new and used Mercedes-Benz Passenger Car Products to customers located within its Area of Influence;

2.      Advertise and merchandise Mercedes-Benz Passenger Car Products, and use current Mercedes-Benz showroom displays, sales materials and other promotional media;

3.      Organize a complete sales organization of the highest quality, ensure that its sale personnel meet the educational and management standards established by MBUSA, and, at Dealer's expense, have such personnel as are appropriate attend all training courses prescribed by MBUSA;

4.      Comply with the Communications Guidelines and Graphic Standards, maintain a high standard of ethics in advertising, promoting and selling Mercedes-Benz Passenger Car Products, and avoid engaging in any misrepresentation or unfair or deceptive practices. Dealer shall discontinue any advertising that MBUSA considers injurious to MBUSA's business or reputation or to the Mercedes-Benz Marks, or that are likely to be violative of applicable laws or regulations; and

5.      Accurately represent to customers the total selling price of Mercedes-Benz Passenger Car Products. Dealer agrees to explain to customers of Mercedes-Benz Passenger Car Products the items that make up the total selling price and to give the customers itemized invoices and all other information required by law. Dealer understands and hereby acknowledges that it may sell Mercedes-Benz Passenger Car Products at whatever price Dealer desires.

## B.      EXPORT POLICY

Dealer is authorized to sell Mercedes-Benz Passenger Cars only to customers residing in the United States of America and its territories (Guam, Puerto Rico, and Virgin Islands). Dealer agrees that it will not sell Mercedes-Benz Passenger Cars for resale or use outside the United States of America or its territories. Dealer agrees to be bound by and comply with any export policy established by MBUSA.

## C.      MERCEDES-BENZ DEALER ASSOCIATION

MBUSA considers participation by Mercedes-Benz passenger car dealers in Mercedes-Benz Passenger Car Dealer Advertising Associations to be a fundamental part of an overall marketing strategy for their businesses and Mercedes-Benz Passenger Car Products. MBUSA urges Dealer to cooperate in the establishment of such an association and to fund its fair share of advertising and merchandising programs undertaken by the association.

### D.   PRE-OWNED VEHICLES

Dealer agrees to display and sell pre-owned Mercedes-Benz vehicles at the Approved Location(s). Dealer shall participate in programs as specified by MBUSA for the sale of such vehicles, and shall maintain the minimum reasonable inventory established by MBUSA from time to time for such operations. Dealer shall conduct its pre-owned Mercedes-Benz vehicle operations in conformance with all standards set forth in this Agreement.

### E.   AREA OF INFLUENCE

MBUSA will assign to Dealer a geographic area consisting of a collection of zip codes or census tracts that is called an Area of Influence ("AOI"). MBUSA may alter or adjust Dealer's AOI at any time. The AOI is a tool used by MBUSA to evaluate Dealer's performance of its primary obligations hereunder. Dealer agrees that it has no right or interest in any AOI and that MBUSA may add new dealers to or relocate dealers into Dealer's AOI. Any such addition or relocation of a dealer will result in an alteration or adjustment of Dealer's AOI.

### F.   EVALUATION OF DEALER'S MARKETING AND SALES PERFORMANCE

MBUSA will periodically evaluate Dealer's sales and marketing performance under this Agreement. Dealer's evaluation will be based on such reasonable criteria as MBUSA may establish, including without limitation: (i) Dealer's reasonable sales objectives that may be established by MBUSA; (ii) Dealer's sales of Mercedes-Benz Passenger Cars as a percentage of registrations of Mercedes-Benz Passenger Cars or Competitive Vehicles in Dealer's AOI; (iii) the registrations of Mercedes-Benz Passenger Cars as a percentage of registrations of Competitive Vehicles in Dealer's AOI; (iv) Dealer's sales or registrations of Mercedes-Benz Passenger Cars as compared to sales or registrations of Mercedes-Benz Passenger Cars by authorized Mercedes-Benz passenger car dealers in other areas, including but not limited to the metropolitan area, market and/or region in which Dealer is located; and (v) Dealer's performance in building and maintaining consumer satisfaction with Dealer and Mercedes-Benz Passenger Car Products. MBUSA will review such evaluations with Dealer, and Dealer shall take prompt corrective action, if required, to improve its performance.

## III.   DEALER'S SERVICE OBLIGATIONS

### A.   CUSTOMER SERVICE STANDARDS

Dealer and MBUSA agree that customer satisfaction and the future growth of their respective businesses is substantially dependent upon the ability of owners of

MB 902 (01/02)                                - 6 -

Mercedes-Benz passenger cars to obtain high-quality servicing from Dealer. Therefore, Dealer agrees to:

1.  Provide prompt, efficient and courteous service of the highest quality for all Mercedes-Benz passenger cars, regardless of where purchased and whether or not under warranty;

2.  Accurately diagnose and advise customers of the necessary repairs, and obtain their consent prior to the initiation of such repairs;

3.  Professionally perform the necessary repairs; and

4.  Treat customers fairly at all times.

## B.   DEALER'S SPECIFIC SERVICE OBLIGATIONS

### 1.   Pre-Delivery Inspections and Service

Dealer shall perform pre-delivery inspections and service on each Mercedes-Benz Passenger Car prior to sale and delivery thereof by Dealer in accordance with the Warranty Manual.

### 2.   Warranty Repairs and Policy Service

Dealer shall promptly, courteously and efficiently perform (i) warranty repairs on each Mercedes-Benz Passenger Car Product that qualifies for such repairs under the provisions of any warranty furnished therewith by MBUSA or DCAG, and (ii) such other inspections, repairs or corrections on Mercedes-Benz Passenger Car Products as may be approved or authorized by MBUSA to be made at MBUSA's expense (hereinafter "policy service"). Dealer shall perform such repairs and service on each such Mercedes-Benz Passenger Car Product as and when requested by the owner or user (or in the case of policy service when requested by MBUSA), without regard to where such Mercedes-Benz Passenger Car Product was purchased and in accordance with the Warranty Manual. MBUSA agrees to compensate Dealer for all warranty repairs and policy service, including labor, diagnosis and Genuine Mercedes-Benz Passenger Car Parts and Accessories, in accordance with procedures and at rates to be established from time to time by MBUSA. Unless otherwise approved in advance by MBUSA, Dealer shall use only Genuine Mercedes-Benz Passenger Car Parts and Accessories when performing Mercedes-Benz warranty repairs and policy service. Warranty repairs and policy service are provided for the benefit of customers, and Dealer agrees that the customer shall not be obligated to pay any charges for such work or any

other services for which Dealer is reimbursed by MBUSA, except as required by law.

**3.     Service Campaign Inspections and Corrections**

Dealer agrees to perform service campaign inspections and/or corrections for owners or users of all Mercedes-Benz Passenger Car Products that qualify for such inspections and/or corrections in accordance with MBUSA's directives and the applicable procedures in the Warranty Manual. MBUSA agrees to reimburse Dealer for all replacement parts and/or other materials required and used in connection with such work and for labor according to such directives and the applicable provisions of the Warranty Manual.

**4.     Roadside Assistance Program**

Dealer agrees to participate in the Mercedes-Benz Roadside Assistance Program as specified by MBUSA.

**C.     USE OF PARTS AND ACCESSORIES IN NON-WARRANTY SERVICE**

Subject to the provisions of Sections I.L and III.B.2, Dealer has the right to sell, install or use for making non-warranty repairs products that are not Genuine Mercedes-Benz Passenger Car Parts and Accessories.

**1.     Quality Standards**

Dealer acknowledges, however, that its customers expect that any parts or accessories that Dealer sells, installs or uses in the sale, repair or servicing of Mercedes-Benz passenger cars are, or meet the high quality standards of, Genuine Mercedes-Benz Passenger Car Parts and Accessories. Dealer agrees that in sales, repairs or servicing where Dealer does not use Genuine Mercedes-Benz Passenger Car Parts and Accessories, Dealer will utilize only such other parts or accessories as:

1.     Will not adversely affect the mechanical operation of the Mercedes-Benz passenger car being sold, repaired or serviced; and

2.     Are equivalent in quality and design to Genuine Mercedes-Benz Passenger Car Parts and Accessories.

Dealer further agrees that it will not offer to sell any parts or accessories that for reasons of quality or image are reasonably objected to by MBUSA.

2.   **Dealer's Disclosures as to Use of and Warranties for Non-Genuine Parts and Accessories**

In order to avoid confusion and to minimize potential customer dissatisfaction, in any non-warranty instance where Dealer sells, installs or uses non-Genuine Mercedes-Benz Passenger Car Parts or Accessories, Dealer shall disclose such fact to the customer and shall advise the customer that the item is not included in warranties furnished by MBUSA or DCAG. Such disclosure shall be written, conspicuous and stated on the customer's copy of the service or repair order or sale document. In addition, Dealer will clearly explain to the customer the extent of any warranty covering the parts or accessories involved and will deliver a copy of the warranty to the customer.

**D.   COMPLIANCE WITH SAFETY AND EMISSION CONTROL REQUIREMENTS**

Dealer agrees to comply and operate consistently with all applicable provisions of the National Traffic and Motor Vehicle Safety Act of 1966, and the Federal Clean Air Act, as amended, including applicable rules and regulations issued from time to time thereunder, and all other applicable federal, state, and local motor vehicle safety and emission control statutes, rules, and regulations.

In the event that the laws of the state in which Dealer is located require motor vehicle dealers or distributors to install in new or used motor vehicles, prior to their sale, any safety devices or other equipment not installed or supplied as standard equipment by DCAG, then Dealer, prior to the sale of any Mercedes-Benz passenger car on which such installations are required, shall properly install such devices or equipment on such Mercedes-Benz passenger cars. Dealer shall comply with state and local laws pertaining to the installation and reporting of such equipment.

In the interest of motor vehicle safety and emission control, MBUSA and Dealer agree to provide to each other such information and assistance as may reasonably be requested by the other in connection with the performance of obligations imposed on either party by the National Traffic and Motor Vehicle Safety Act of 1966, and the Federal Clean Air Act, as amended, and their rules and regulations, and all other applicable federal, state and local motor vehicle safety and emission control statutes, rules and regulations.

Dealer further agrees that should MBUSA place any new Mercedes-Benz Passenger Cars in Dealer's stock on retail hold pending the resolution of any federal or state regulatory compliance issue, MBUSA may, but shall not be required to, elect to repurchase said retail held Mercedes-Benz Passenger Cars. Should MBUSA so elect, Dealer agrees that it shall immediately sell the

Mercedes-Benz Passenger Cars back to MBUSA and withhold from retail sale all such Mercedes-Benz Passenger Cars still in its inventory at the time of said election as MBUSA may reasonably determine.  In the event of such a repurchase, the price to be paid by MBUSA to Dealer shall be only the price paid by the Dealer to MBUSA for said Mercedes-Benz Passenger Car.  MBUSA shall not be obligated to reimburse any other costs to Dealer with respect to Dealer's purchase or MBUSA's repurchase of the Mercedes-Benz Passenger Cars. MBUSA shall make payment to the Dealer immediately upon transfer of title to the Mercedes-Benz Passenger Car to MBUSA.  During the period from MBUSA's repurchase of Mercedes-Benz Passenger Cars until the Mercedes-Benz Passenger Cars resale to Dealer, the subject Mercedes-Benz Passenger Cars shall remain in the possession, custody and control of Dealer as bailee of MBUSA. Upon the occurrence of the resolution of the event requiring the issuance of the retail hold and Mercedes-Benz Passenger Car repurchase via the issuance of appropriate repair instructions to the Dealer, MBUSA shall resell those Mercedes-Benz Passenger Cars to Dealer and Dealer hereby agrees to accept those Mercedes-Benz Passenger Cars and further agrees that it will only retail sell the Mercedes-Benz Passenger Cars upon completion of the work by dealer required to bring the Mercedes-Benz Passenger Car into regulatory compliance."

## E.   COMPLIANCE WITH CONSUMER PROTECTION STATUTES, RULES AND REGULATIONS

Dealer agrees to comply and operate consistently with all applicable provisions of consumer protection statutes, rules and regulations (hereinafter "consumer protection laws").  Because certain customer complaints may impose liability upon MBUSA under consumer protection laws, Dealer agrees to provide prompt notice to MBUSA of such complaints and take such other steps as MBUSA may require.  Dealer also agrees to provide applicable required customer notifications and disclosures as prescribed by consumer protection laws.  Dealer will do nothing to affect adversely MBUSA's rights under consumer protection laws.

## IV.   DEALER'S SERVICE AND PARTS ORGANIZATION

### A.   ORGANIZATION AND STANDARDS

Dealer agrees to organize and maintain a complete service and parts organization of the highest quality, including a qualified service manager, parts manager, diagnostic specialists, technicians and a sufficient complement of qualified service and parts personnel as recommended by MBUSA.  Dealer's personnel will meet the educational, management and technical training standards reasonably established by MBUSA and, at Dealer's expense, will complete all service, parts and customer satisfaction training courses prescribed by MBUSA.

MB 902 (01/02)                                    - 10 -

## B.    SERVICE EQUIPMENT AND SPECIAL TOOLS

Anything herein to the contrary notwithstanding, if MBUSA determines that
Dealer requires Mercedes-Benz Special Tools and Service Equipment to service a
model of Mercedes-Benz Passenger Cars, dealer acknowledges that it has no right
to purchase such model from MBUSA unless and until it has acquired all such
Mercedes-Benz Special Tools and Service Equipment and completed all related
training courses prescribed by MBUSA.

### 1.  Mercedes-Benz Special Tools

Dealer agrees to purchase from MBUSA all Mercedes-Benz Special Tools of
Category A and B ("Category A and B Tools") as may be reasonably required
by MBUSA and which are the minimum required for the service,
maintenance, and repair of Mercedes-Benz Passenger Cars regardless of size.
Delivery of Category A and B Tools by MBUSA to Dealer will be automatic
and via a timetable determined appropriate by MBUSA in its reasonable
discretion.  Dealer may also acquire, at their own discretion, Mercedes-Benz
Special Tools of Category C for larger scale repairs.

Dealer agrees to maintain all Mercedes-Benz Special Tools in operational
condition and in calibration as designated by MBUSA.  Dealer will manage
the inventory of Mercedes-Benz Special Tools using a storage and inventory
management system specified by MBUSA.  Dealer agrees that such inventory
will be subject to periodic inspection by MBUSA.

In the event a dealer utilizes its own body shop, dealer agrees to acquire
Mercedes-Benz Special Tools of Category K for use in the repair of Mercedes-
Benz Passenger Cars as specified by the Mercedes-Benz repair procedure.
Dealers that sublet body shop repairs shall use its best efforts to monitor,
advise, and assure these locations are equipped with the necessary Mercedes-
Benz tools, repair instructions, and training support to perform the repairs.

### 2.  Mercedes-Benz Service Equipment

Dealer agrees to acquire approved Service Equipment designated as Basic
Equipment ("BE") pursuant to the MBUSA Standard Service Equipment
Program. Dealer agrees to maintain this equipment in operational condition
and in calibration as designated by MBUSA.

## C.    PARTS STOCKING AND SERVICE LEVELS

Dealer agrees to maintain its parts stock at minimum stocking and service levels
reasonably established by MBUSA.

**D.     AFTER-HOURS DELIVERY**

Dealer agrees to provide MBUSA, upon request, access to a secure area for after-hours parts or passenger car delivery.

**E.     ASSISTANCE PROVIDED BY MBUSA**

**1.     Service Manuals and Materials**

MBUSA agrees to make available to Dealer copies of such service manuals and bulletins, publications, computer software and technical data as MBUSA shall deem to be necessary for the needs of Dealer's service and parts organization.  Dealer shall be responsible for keeping such manuals and materials current and available for consultation by its employees.

**2.     Field Personnel Assistance**

To assist Dealer in handling its responsibilities under this Agreement, MBUSA agrees to make available qualified field personnel who will, from time to time, advise and counsel Dealer on service-related subjects, including service policies, product and technical adjustments, repair and replacement of product components, customer relations, warranty administration, service and parts merchandising, and personnel/management training.

**F.     EVALUATION OF DEALER'S SERVICE AND PARTS PERFORMANCE**

MBUSA will periodically evaluate Dealer's: (i) service performance in areas such as dealer's service of Mercedes-Benz Passenger Cars as a percentage of registrations of Mercedes-Benz Passenger Cars in Dealer's AOI, customer satisfaction, warranty administration, service repairs, service management, facilities, operating procedures and new vehicle pre-delivery service; and (ii) parts purchases, sales, operations, facilities, tools and equipment.  MBUSA will review such evaluations with Dealer, and Dealer shall take prompt action to improve the service and parts performance to satisfactory levels as MBUSA may require.  Such action shall, if requested by MBUSA, include an action plan by Dealer for improvement of service and parts performance within a specific time period approved by MBUSA, including but not limited to the establishment of additional space, facilities or locations for such operations.

### G.    ADDITIONAL FACILITIES OR LOCATIONS

If, with MBUSA's prior written consent, Dealer establishes additional facilities or locations for its service and parts operations, Dealer shall meet the facilities, identification, organizational, equipment, parts stocking and other standards reasonably established by MBUSA from time to time for such facilities or locations.

## V.    CUSTOMER SATISFACTION RESPONSIBILITIES

The "Three-Pointed Star" is the symbol of automotive excellence. In furtherance of that image and reputation, MBUSA and Dealer agree to conduct their respective businesses in a manner that achieves the highest levels of customer satisfaction by marketing the finest products and providing the best service in the automotive industry.

### A.    DEALER'S CUSTOMER SATISFACTION OBLIGATIONS

Dealer will be responsible for satisfying Mercedes-Benz customers in all matters except those that are directly related to product design and manufacturing. Dealer will take all reasonable steps to ensure that each customer is completely satisfied with Mercedes-Benz Passenger Car Products and the services and practices of Dealer. Dealer will not engage in any practice or method of operation if its nature or quality may impair the reputation of MBUSA or Mercedes-Benz Passenger Car Products.

#### 1.    Dealer's Customer Satisfaction Plan

Upon MBUSA's request, Dealer shall provide a detailed plan of Dealer's customer satisfaction program to MBUSA and shall implement such program on a continuous basis. This plan shall include an ongoing system for emphasizing customer satisfaction to all Dealer's employees, for training Dealer employees and for conveying to customers that Dealer is committed to the highest possible level of customer satisfaction.

#### 2.    Employee Training

Dealer agrees to participate and to have its employees participate, at Dealer's expense, in Mercedes-Benz customer satisfaction training as required by MBUSA.

#### 3.    Customer Assistance Response System

Dealer agrees to implement a system, approved by MBUSA that will respond immediately to requests for customer assistance from MBUSA.

**B.      EVALUATION OF DEALER'S CUSTOMER SATISFACTION PERFORMANCE**

MBUSA periodically will evaluate Dealer's customer satisfaction performance based on the following considerations and efforts by Dealer.

1.      MBUSA will provide Dealer with Customer Relationship Index ("CRI") reports or such other equivalent data as will permit Dealer to assess its performance and maintain the highest level of customer satisfaction. Dealer agrees to review with its employees on a regular basis the results of the customer satisfaction reports or other data it receives.

2.      Dealer shall continuously develop and implement specific action plans to improve its customer satisfaction performance and results. The plans are to be reviewed with MBUSA on a basis that MBUSA deems appropriate. Dealer will respond on a timely basis to requests from MBUSA to take action on unsatisfactory customer satisfaction matters and to commit necessary resources to remedy deficiencies reasonably specified by MBUSA.

**VI.    DEALERSHIP FACILITIES AND IDENTIFICATION**

**A.      LOCATION AND FACILITIES**

Dealer shall provide Dealership Facilities at the Approved Location(s) that (i) will enable Dealer to effectively perform its responsibilities under this Agreement, (ii) are satisfactory in space, appearance, layout, equipment and corporate identification, and (iii) are otherwise substantially in accordance with the Dealer AOI Space Analysis Addendum, Dealership Facility Planning & Corporate Identification Manual, and such other standards as MBUSA may establish from time to time. Dealer shall conduct its Dealership Operations only from the Approved Location(s). If the Approved Location(s) is comprised of more than one place of business, Dealer shall use each such place of business only for the purposes specified therefor in Paragraph F and the Final Paragraph of this Agreement and, if applicable, in the Dealer AOI Space Analysis Addendum.

**B.      CHANGES AND ADDITIONS**

Dealer shall not move, relocate or change the designated usage or function of the Approved Location(s) or any of the Dealership Facilities, or substantially modify any of the Dealership Facilities, nor shall Dealer or any person named in the Final Paragraph of this Agreement directly or indirectly establish or operate any other locations or facilities for the sale or servicing of Mercedes-Benz Passenger Car Products or for the conduct of any other of the Dealership Operations

contemplated by this Agreement, without the prior written consent of MBUSA. Any changes in the Approved Location(s) or the Dealership Facilities that may be agreed to by MBUSA and Dealer may be reflected in a new Agreement or in a new Dealer AOI Space Analysis Addendum.

In particular, Dealer acknowledges that the addition of sales, service or parts operations for another line of vehicles to the Dealership Facilities or at the Approved Location(s) could adversely affect Dealer's sales, service and parts performance with respect to Mercedes-Benz Passenger Car Products. Accordingly, to give MBUSA an adequate opportunity to evaluate the effect of such a proposed addition and to determine whether or not to consent thereto, Dealer agrees to notify MBUSA in writing at least sixty (60) days before Dealer enters into any agreement or letter of intent with respect to the addition of such sales, service or parts operations to the Dealership Facilities or at the Approved Location(s).

## C.   DEALER'S OPERATING HOURS

Dealer agrees to conduct Dealership Operations during all days and hours that are customary and lawful for such operations in the community or locality in which Dealer is located and in accordance with industry standards. In addition, when necessary to accommodate customer needs, Dealer shall extend its operating hours.

## D.   CORPORATE IDENTITY

Subject to applicable governmental statutes, ordinances and regulations, Dealer agrees to erect, display and maintain, at Approved Location(s) only and at Dealer's sole expense, such standard authorized product and service signs and other corporate identity elements as are specified in the Dealership Facility Planning & Corporate Identification Manual or otherwise required by MBUSA from time to time.

## E.   EVALUATION OF DEALERSHIP FACILITIES

MBUSA will periodically evaluate the Dealership Facilities. In making such evaluations, MBUSA may consider, among other things: the actual building and land provided by Dealer for the performance of its responsibilities under this Agreement; compliance with MBUSA's current requirements for Dealership Operations; the appearance, condition, layout and signage of the Dealership Facilities; and such other factors as in MBUSA's opinion may relate to Dealer's performance of its responsibilities under this Agreement. MBUSA will discuss such evaluations with Dealer, and Dealer shall take prompt action to comply with MBUSA's recommendations and minimum facility standards.

**F.  OWNERSHIP AND USE OF MERCEDES-BENZ MARKS**

**1.  Validity and Exclusive Ownership of Mercedes-Benz Marks**

Dealer acknowledges the validity and DCAG's exclusive ownership of the Mercedes-Benz Marks, and agrees not to contest the same during the term of the Agreement or at any time thereafter.  Dealer and MBUSA agree to cooperate with each other in preventing any acts of trademark infringement or unfair competition with respect to any Mercedes-Benz Mark, but DCAG or MBUSA shall have sole control over all actions and legal proceedings to redress infringement of or any unfair competition with respect to any Mercedes-Benz Mark.

**2.  Use by Dealer**

MBUSA grants Dealer a non-exclusive license to use the Mercedes-Benz Marks subject to the terms and conditions of the Agreement and the Dealership Facility Planning & Corporate Identification Manual.  Dealer agrees that it will use the Mercedes-Benz Marks only in connection with the sale and servicing of Mercedes-Benz Passenger Car Products and only in such manner, at such location, to such extent, and for such purposes as MBUSA may specify from time to time.  Dealer shall promptly change or discontinue its use of any Mercedes-Benz Marks upon MBUSA's request.  Dealer shall not use the Mercedes-Benz Marks as part of its corporate or business name without MBUSA's prior written consent.

**3.  Discontinuance of Use**

Upon termination of this Agreement, Dealer agrees that it shall immediately:

a.  Discontinue the use of the word Mercedes-Benz and the Mercedes-Benz Marks, or any semblance of same, including without limitation, the use of all stationery, telephone directory listing and other printed material referring in any way to Mercedes-Benz or bearing any Mercedes-Benz Mark;

b.  Discontinue the use of the word Mercedes-Benz or the Mercedes-Benz Marks, or any semblance of same, as part of its business or corporate name, and file a change or discontinuance of such name with appropriate authorities;

c.  Remove all product signs bearing said word(s) or Mercedes-Benz Marks at Dealer's sole cost and expense;

d.  Cease representing itself as an authorized Mercedes-Benz passenger car dealer; and

e.  Refrain from any action, including without limitation, any advertising, stating or implying that it is authorized to sell or distribute Mercedes-Benz Passenger Car Products.

**4.  Enforcement**

In the event Dealer fails to comply with the terms and conditions of this Section VI.F, MBUSA shall have the right, in its sole discretion, to effect compliance through litigation and/or to enter upon Dealer's premises and remove, without liability, all such product signs and identification bearing the word Mercedes-Benz or any Mercedes-Benz Mark. Dealer agrees that it shall reimburse MBUSA for any costs and expenses incurred in such litigation and/or removal, including reasonable attorney fees.

## VII.  WARRANTIES

The only warranties of MBUSA or DCAG applicable to Mercedes-Benz Passenger Car Products shall be the New Vehicle Limited Warranty or such other written warranties that may be expressly furnished by MBUSA or DCAG. Except for its express limited liability under such written warranties, MBUSA and DCAG do not assume any additional warranty obligations or liabilities in connection with any Mercedes-Benz Passenger Car Products. Dealer is not authorized to assume any additional obligations or liabilities on behalf of MBUSA or DCAG. Any such additional obligations assumed by Dealer shall be the sole responsibility of Dealer.

Dealer shall expressly incorporate in full and without modification any warranty furnished by MBUSA or DCAG with a Mercedes-Benz Passenger Car as a conspicuous part of each order form or other contract for the sale of such a Mercedes-Benz Passenger Car by Dealer to any buyer. Dealer shall make available to the buyer of each Mercedes-Benz Passenger Car Product prior to the purchase of such Mercedes-Benz Passenger Car Product, copies of such applicable warranties as may be furnished by MBUSA or DCAG. Dealer shall also provide to the buyer of each Mercedes-Benz Passenger Car Product, in full and without modification, any owner's manual, warranty booklet or other owner information which MBUSA or DCAG may provide to Dealer for delivery with such Mercedes-Benz Product. Dealer agrees to abide by and implement in all other respects MBUSA's warranty procedures then in effect.

## VIII.   CAPITAL, CREDIT, RECORDS AND UNIFORM SYSTEMS

### A.   NET WORKING CAPITAL

Dealer agrees to establish and maintain actual net working capital in an amount not less than the minimum net working capital specified by MBUSA.  MBUSA will have the right to modify the amount of net working capital required, and Dealer agrees promptly to establish and maintain the required amount.

### B.   FLOORING AND LINES OF CREDIT

Dealer agrees to obtain and maintain at all times a confirmed and adequate flooring line with a bank or financial institution or other method of financing acceptable to MBUSA to enable Dealer to perform its obligations pursuant to this Agreement.

MBUSA may increase the required amounts of flooring or lines of credit, and Dealer agrees promptly to establish and maintain the increased amount.

Subject to the foregoing obligations, Dealer is free to do its financing business, wholesale, retail or both, with whomever it chooses and to engage in retail financing activity to the extent it desires.

### C.   PAYMENT TERMS

All monies or accounts due Dealer from MBUSA will be considered net of Dealer's indebtedness to MBUSA.  MBUSA may deduct or offset any amounts due or to become due from Dealer to MBUSA, or any amounts held by MBUSA, from or against any sums or accounts due or to become due from MBUSA to Dealer; provided, however, that MBUSA shall not deduct or offset such amounts for any transaction where MBUSA has failed to provide written notice to Dealer of the amounts due within six (6) months of the transaction.  Payments by Dealer to MBUSA shall be made in such a manner as prescribed by MBUSA and shall be applied against Dealer's indebtedness in accordance with MBUSA's policies and practices.  If Dealer disputes any deduction or offset imposed by MBUSA pursuant to this Section VIII.C, it shall provide written notice of such dispute to MBUSA within ninety (90) days of the date on which MBUSA imposed such deduction or offset.  If Dealer fails to provide such notice to MBUSA within that 90-day period, it shall be deemed to have waived any right that it may have to challenge such deduction or offset before any court, administrative agency or governmental body.

**D.    UNIFORM ACCOUNTING SYSTEM**

Dealer agrees to maintain its financial books and records in accordance with the Mercedes-Benz Accounting Manual, as amended from time to time by MBUSA. In addition, Dealer shall furnish to MBUSA complete and accurate financial or operating information, including without limitation, a financial and/or operating statement covering the current month and calendar year-to-date operations and showing the true and accurate condition of Dealer's business.  Dealer shall promptly furnish to MBUSA copies of any adjusted annual statements, including any and all adjusted, year-end statements prepared for tax or any other purposes. All such information shall be furnished by Dealer to MBUSA via MBUSA's electronic communications network and in such a format and at such times as prescribed by MBUSA.  If requested by MBUSA, Dealer shall furnish to MBUSA an audited annual financial statement.

**E.    RECORDS MAINTENANCE**

Dealer agrees to keep complete, accurate and current records regarding its sale, leasing and servicing of Mercedes-Benz Passenger Car Products for a minimum of seven (7) years, exclusive of any retention period required by any governmental entity. Dealer shall prepare, keep current and retain records in support of requests for reimbursement for warranty and policy work performed by Dealer in accordance with the Warranty Manual.

**F.    EXAMINATION OF DEALERSHIP ACCOUNTS AND RECORDS**

MBUSA shall have the right at all reasonable times and during regular business hours to inspect the Dealership Facilities and to examine, audit and reproduce all records, accounts and supporting data relating to all dealership operations for any line of vehicles conducted in the Dealership Facilities or at the Approved Location(s), including without limitation, sales reporting, service and repair of Mercedes-Benz Passenger Car Products by Dealer.

**G.    TAXES**

Dealer shall be responsible for and duly pay all sales taxes, use taxes, excise taxes and other governmental or municipal charges imposed, levied or based upon the purchase or sale of Mercedes-Benz Passenger Car Products by Dealer, and shall maintain accurate records of the same.

**H.    CONFIDENTIALITY**

MBUSA agrees that it shall not provide any data or documents submitted to it by Dealer to any third party unless authorized by Dealer, required by law, or required

to generate composite or comparative data for analytical purposes. Dealer agrees to keep confidential and not to disclose, directly or indirectly, any information that MBUSA designates as confidential.

## I.   MERCEDES-BENZ DEALER COMMUNICATIONS SYSTEM AND PROPRIETARY MANUFACTURER SYSTEMS

MBUSA has established the Mercedes-Benz Dealer Communications System ("DCS") to retrieve information from and disseminate information to Dealer. The DCS (which is presently called NetStar) collects parts, warranty and financial data from Dealer, and provides access to various reports, data bases and administrative messages to Dealer. Dealer shall utilize the DCS to provide such information to MBUSA as MBUSA shall specify from time to time. Dealer shall acquire, install and maintain at its expense the necessary equipment and systems compatible with the DCS, as well as other proprietary manufacturer systems, which are deemed necessary by MBUSA to transact business and serve customers in the most efficient manner.

## J.   SALES REPORTING

Dealer agrees to accurately report to MBUSA, with such relevant information as MBUSA may reasonably require, the delivery of each Mercedes-Benz Passenger Car and pre-owned Mercedes-Benz vehicle to an ultimate consumer by the end of the day in which the vehicle is delivered to such ultimate consumer, and to furnish MBUSA with such other reports as MBUSA may reasonably require in accordance with MBUSA's Ultimate Consumer DDR Reporting Provision or such other sales reporting requirements (i.e. reporting of sales, customer traffic, and customer order banks) as MBUSA may establish from time to time.

## IX.   TRANSFERS

## A.   SALE OF ASSETS OR OWNERSHIP INTEREST

This is a personal service agreement that MBUSA has entered into in reliance upon the personal qualifications, reputation, integrity, expertise and commitment of Owners and Dealer Operator. For this reason, Dealer agrees to obtain MBUSA's prior written consent to any proposed sale or transfer of Dealer's principal assets or any ownership interest of Owner, which consent shall not be unreasonably withheld.

MBUSA shall not be obligated to execute a new Agreement with a proposed transferee of such assets or ownership interest unless Dealer first makes arrangements acceptable to MBUSA to satisfy any outstanding indebtedness to MBUSA.